**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| ACP LAND LLC, THE EPISCOPAL DIOCESE OF RHODE ISLAND, SUNVESTMENT ENERGY GROUP NY 64 LLC, SARANAC LAKE COMMUNITY SOLAR, LLC, TYNGSBORO SPORTS II SOLAR, LLC, and 201 OAK PEMBROKE SOLAR LLC, *individually and on behalf of all others similarly situated*, | CASE NO. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| vs. | **JURY TRIAL DEMANDED** |
| NATIONAL GRID PLC, NATIONAL GRID USA SERVICES CO., INC., THE NARRAGANSETT ELECTRIC COMPANY, NIAGARA MOHAWK POWER CORPORATION, MASSACHUSETTS ELECTRIC COMPANY, and NANTUCKET ELECTRIC COMPANY, | |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF THE ACTION ........................................................... 1

PARTIES .................................................................................................................... 4

JURISDICTION AND VENUE ...................................................................................... 9

CLASS ALLEGATIONS ............................................................................................... 9

FACTS ..................................................................................................................... 12

    A.    Utilities Are Deliberately Undermining Public Policies Supporting
           Distributed Generation of Renewable Energy ........................................ 12

    B.    In Violation of Public Policy, National Grid Has Acted Broadly
           to Obstruct Independent Renewable Energy Generators ...................................... 17

    C.    National Grid Charged Improper Pass-Through Taxes to
           Interconnect Plaintiffs' Renewable Energy Projects ............................................ 19

    D.    Despite the Fact That Its Own Consultant's Tax Opinion Found
           Plaintiffs' Position "Compelling," and Contrary to the Opinion
           of Its Own Director of U.S. Tax Research and Planning,
           National Grid Insisted That the Tax Was Owed .................................................... 22

    E.    State Public Utility Commissions Are Unable to Resolve This Dispute .............. 27

CAUSES OF ACTION .................................................................................................. 30

    I.    DECLARATORY JUDGMENT ...................................................................... 30

    II.    BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING .......... 31

    III.    RESTITUTION AND UNJUST ENRICHMENT ................................................. 33

    IV.    CONVERSION (R.I.) ....................................................................................... 35

    V.    INTERCONNECTION STANDARDS (R.I.)........................................................ 36

    VI.    JUST AND REASONABLE CHARGES (R.I.).................................................... 36

    VII.    JUST AND REASONABLE CHARGES (N.Y.) ................................................ 37

PRAYER FOR RELIEF .................................................................................................. 38

DEMAND FOR JURY TRIAL ......................................................................................... 39

## INTRODUCTION AND SUMMARY OF THE ACTION

1.      Plaintiffs are independent renewable energy generators.  Defendants are electric power utilities, all subsidiaries of National Grid PLC.  Defendants compete with plaintiffs, and concededly have an interest in increasing their costs.  In furtherance of that interest, defendants have wrongfully passed through to plaintiffs a charge related to a purported federal tax that was not actually owed.

2.      The named plaintiffs herein are (i) ACP Land LLC and the Episcopal Diocese of Rhode Island (the "Rhode Island Plaintiffs"); (ii) Sunvestment Energy Group NY 64 LLC and Saranac Lake Community Solar, LLC (the "New York Plaintiffs"); and (iii) Tyngsboro Sports II Solar, LLC and 201 Oak Pembroke Solar LLC (the "Massachusetts Plaintiffs").  They bring this action on their own behalf and on behalf of three subclasses of independent generators of solar power in Rhode Island, New York, and Massachusetts (collectively, "Plaintiffs") who entered into Interconnection Service Agreements ("ISAs") with one of the defendant electric utility companies.

3.      Defendants National Grid PLC and its subsidiaries National Grid USA Services Co., Inc., The Narragansett Electric Company, Niagara Mohawk Power Corporation, Massachusetts Electric Company, and Nantucket Electric Company (collectively, "Defendants" or "National Grid") distribute electricity through the power grids that they maintain in parts of Rhode Island, New York, and Massachusetts.  They are responsible for interconnecting Plaintiffs' projects with the grid.  They subsequently purchase electricity generated by those projects.

4.      Under applicable law and/or tariffs and the ISAs that Plaintiffs signed, they are required to pay National Grid for any upgrades or modifications to the power grid that are necessary to interconnect their projects, and that thereafter become the property of National Grid.

Such modifications might include new power lines, substations, or other upgrades to National Grid's systems to enable it to accept additional electricity.

5. Independent renewable energy generators like Plaintiffs compete with electric utility companies like Defendants because the utilities, through subsidiaries, have ownership interests in power generation, both from renewables and from traditional sources.

6. Independent renewable energy generators also challenge the utilities' business model more broadly because they threaten utilities' ability to recoup from ratepayers their past investments in generating plants. Utilities view independent generators as contributing to what industry observers have described as a potential "utility death spiral." In 2013, the Edison Electric Institute, the industry association for investor-owned electric utilities, explicitly suggested that the industry take self-protective measures lest it follow Kodak and the land-line telephone companies into oblivion. Specifically, the Edison Electric Institute suggested that utilities take steps to disincentivize independent generation by imposing greater costs on it.

7. One of the ways in which National Grid increases Plaintiffs' costs is by wrongfully claiming that it must pay income tax on Plaintiffs' interconnection payments and passing through to Plaintiffs an amount purportedly necessary to make it whole. This charge, referred to as a "tax gross up adder" or "tax gross up," is equal to the purported income tax minus National Grid's tax savings from depreciating the newly acquired assets.

8. In fact, the text of 26 U.S.C. § 118 and applicable Internal Revenue Service ("IRS") Notices make plain that no tax is owed on Plaintiffs' interconnection payments: in contradistinction to "contributions in aid of construction" or "CIACs," which are income to the utility and therefore taxable, these payments to the utility are contributions to its capital, and as such are tax exempt.

9.     Congress and the IRS have explained the distinction:  CIACs are interconnection payments that are advance payments for service by <u>customers who will purchase electricity from a utility</u>.  In contrast, the independent renewable energy generators are not purchasers of electricity, but rather suppliers.  Their payments for interconnection enable <u>the utility to purchase power from them</u>.  Because their interconnection payments are not advance payments for future service, they do not constitute taxable income to the utility.

10.     In Notices issued in 1988 and subsequently, the IRS defined a safe harbor that distinguishes payments by customers, which are taxable as income, from contributions by independent generators, which are not.  Plaintiffs are within that safe harbor.

11.     In the face of overwhelming evidence to the contrary, National Grid nevertheless insists that the tax status of Plaintiffs' interconnection payments is ambiguous and further that because the IRS <u>might</u> treat these payments as CIACS, it must pay the tax.  It does so even in the face of the opinion of its own Director of U.S. Tax Research and Planning that the tax is not owed and the opinion of its consultant, Ernst & Young, LLP, that a "compelling" case can be made that it is not owed.

12.     National Grid could simply not pay this tax, without risking any penalty—or it could pay it and seek a refund.  Unlike any other rational taxpayer, it has done neither.  That is not only because National Grid does not bear the economic burden of the tax, but also because it has an active interest in increasing the interconnection costs of independent generators by passing the burden through to them.

13.     National Grid's actions, as further described below, thwart federal and state policies promoting the development of distributed energy resources ("DERs") to address climate change and provide more secure, cheaper, and cleaner local electricity to consumers.

14. Those actions give rise to Plaintiffs' claims for breach of the covenant of good faith and fair dealing and for restitution under the common laws of Rhode Island, New York, and Massachusetts; for conversion under the common law of Rhode Island; and for violations of state laws requiring just and reasonable rates and that interconnection charges be limited to those strictly required for interconnection. Plaintiffs also seek a declaratory judgment pursuant to 28 U.S.C. § 2201(a) that their payments to National Grid for modifications of the power grid are not taxable as income to National Grid.

## PARTIES

15. **Plaintiff ACP Land LLC** ("ACP") is a Rhode Island limited liability company located at 244 Gano Street, Providence, R.I. On January 28, 2013, ACP executed an ISA with National Grid to develop a 404-kilowatt solar project on the roof of a commercial building in Middletown, R.I. The project was completed that same year. ACP ultimately paid $3,104.05 in purported taxes passed through to it by National Grid.

16. On January 25, 2014, ACP, together with another entity, Wind Energy Development LLC ("WED"), filed a petition at the Rhode Island Public Utilities Commission ("RIPUC") challenging National Grid's imposition of the tax gross up at issue here (the "Petition").[1]

17. Nearly three years later, on November 27, 2017, RIPUC issued an order in which it declined to rule on whether National Grid in fact owed the tax at issue, but ruled that National

---

[1] Petition of Wind Energy Development, LLC & ACP Land, LLC for Dispute Resolution Relating to Interconnection with Narragansett Electric Company (RIPUC Dkt. No. 4483, Jan. 15, 2014), http://www.ripuc.ri.gov/eventsactions/docket/4483-WindEnergy-ACP-Petition_1-16-14.pdf.

Grid had nevertheless acted reasonably in passing it through to Plaintiff ACP.[2]  That ruling was affirmed by the Rhode Island Supreme Court on June 1, 2020—over six years after ACP commenced its proceeding at the RIPUC.[3]

18.     **Plaintiff the Episcopal Diocese of Rhode Island** (the "Diocese") is a religious organization with offices located at 275 North Main Street, Providence, R.I.  In January 2018, the Diocese applied to National Grid for interconnection of a proposed solar project on the grounds of its Episcopal Conference Center and Camp in Glocester, R.I.  The project is intended to generate rent to save the economics of its summer camp for urban youth while providing the benefit of clean lower cost electricity to Diocese parishes and facilities and fulfilling the Diocese mission of Creation Care.  National Grid has estimated the tax pass-through payment for the project at $88,771 on total estimated costs of $994,586.  The Diocese paid the first 25 percent, including $22,193 for tax, upon execution of the ISA, on or about September 21, 2020, after the Rhode Island Supreme Court ruled on the Petition.

19.     **Plaintiff Sunvestment Energy Group NY 64 LLC** ("Sunvestment") is a New York limited liability company with a business address at 4700 Pottsville Pike, Reading, Pennsylvania.  On August 16, 2019, Sunvestment executed an ISA with Niagara Mohawk Power Corporation d/b/a National Grid to operate a 4.06-megawatt solar project located at 5563 Lakeville Road, Geneseo, New York.  On December 27, 2019, National Grid invoiced Sunvestment $315,931 for upgrades to interconnect the project including a tax amount of $17,556.76.  The invoice was paid on July 24, 2019.

---

[2] RIPUC Order No. 22957, at 7, 21 (RIPUC Dkt. No. 4483, Nov. 27, 2017), http://www.ripuc.ri.gov/eventsactions/docket/4483-WED-NGrid-Ord22957_11-27-17.pdf.
[3] *ACP Land, LLC v. R.I. Pub. Utils. Comm'n*, 228 A.3d 328, 338 (R.I. 2020).

20.     **Plaintiff Saranac Lake Community Solar, LLC** ("Saranac") is a New York limited liability company headquartered at 125 Tech Park Drive, Rochester, NY 14623. On February 13, 2019, Sunvestment Group LLC, a member of Saranac, executed an ISA with National Grid on behalf of Saranac to operate a 2.06-megawatt solar project located at 2089 State Rte. 86, Saranac Lake, New York. On July 26, 2019, National Grid sent Saranac an invoice for $336,390 for upgrades to interconnect the project including a tax amount of $40,000.47. Saranac paid the tax on November 3, 2017.

21.     **Plaintiff Tyngsboro Sports II Solar, LLC** ("Tyngsboro") is a limited liability company with the address c/o MassAmerican Energy LLC, 490A, Boston Post Road, Sudbury, MA 01776. On December 20, 2018, MassAmerican Energy LLC executed an ISA with Massachusetts Electric Company d/b/a National Grid to operate a 249.8-kilowatt solar project located at 18 Progress Avenue, Tyngsborough, MA 01879. On December 23, 2018, MassAmerican Energy LLC assigned its interest in the ISA to Tyngsboro. On March 18, 2019, National Grid sent Tyngsboro an invoice for the first installment payment for system upgrades, including $2,484.94 in tax. On August 2, 2019, National Grid sent Tyngsboro an invoice for the second installment payment for system upgrades, including $828.31 in tax. Tyngsboro made its first installment payment on October 7, 2019, and made its second installment payment on January 27, 2020.

22.     **Plaintiff 201 Oak Pembroke Solar LLC** ("Oak Pembroke") is a limited liability company with address c/o MassAmerican Energy LLC, 490A Boston Post Road, Sudbury, MA 01776. On July 15, 2020, Oak Pembroke executed an ISA with National Grid to operate a 249-kilowatt solar system located at 201 Oak Street, Pembroke, Massachusetts. On July 22, 2020,

National Grid invoiced 201 Oak Pembroke $121,249 for upgrades, including $14,016.94 in tax. Oak Pembroke paid that invoice on February 5, 2021.

23.    **Defendant National Grid PLC** ("UK National Grid") is a United Kingdom public limited liability company with its principal place of business in London, England.  UK National Grid is publicly traded on the New York Stock Exchange.  Its 2019/2020 Annual Report ("2020 AR") disclosed an annual operating profit of $3.58 billion.[4]  UK National Grid spent $4.12 billion on energy infrastructure over that year, generating a net revenue of $7.93 billion driven by accelerated growth in the U.S. rate base of 12.2 percent.[5]  UK National Grid conducts much of its business in the United States through its United States subsidiary, National Grid USA Services Co., Inc.

24.    The other Defendants named herein are direct or indirect subsidiaries of UK National Grid.  All do business under the name of National Grid.  They are referred to hereinafter, collectively and individually, as "National Grid."

25.    **Defendant National Grid USA Services Co., Inc.** ("US National Grid") is a Massachusetts corporation with its principal place of business in Waltham, Massachusetts, a subsidiary of UK National Grid, and the parent company of The Narragansett Electric Company, Massachusetts Electric Company, and Niagara Mohawk Power Corporation, all doing business under the name "National Grid."  These subsidiaries carry electricity across electrical transmission and distribution lines to about 3.4 million customers in Rhode Island, Massachusetts, and New York.  US National Grid reported an adjusted annual operational profit of £1.39 billion—$1.80

---

[4] *Annual Report and Accounts 2019/2020*, NATIONAL GRID PLC, 28,
https://www.annualreports.com/HostedData/AnnualReports/PDF/NYSE_NGG_2020.pdf.
[5] *Id.* at 19, 40.

billion—in 2019/2020, spending £3.2 billion—$4.16 billion—on energy infrastructure in its United States-regulated markets.[6]

26. **Defendant, The Narragansett Electric Company**, d/b/a National Grid ("Narragansett"), is a Rhode Island corporation located at 280 Melrose Street, Providence, Rhode Island, and is a subsidiary of UK National Grid and US National Grid. Narragansett owns and operates the retail distribution system providing electric service to approximately 507,000 customers and gas service to approximately 273,000 in 38 cities and towns in Rhode Island. Narragansett's service territory covers substantially all of Rhode Island.

27. **Defendant Niagara Mohawk Power Corporation**, d/b/a National Grid ("Niagara"), is a New York corporation located at 80 State Street, Albany, New York 12207, and is a subsidiary of UK National Grid and US National Grid. Niagara is engaged principally in the regulated energy delivery business in New York State, provides electric service to approximately 1.7 million customers in the areas of eastern, central, northern, and western New York, and sells, distributes, and transports natural gas to approximately 0.6 million customers in the areas of central, northern, and eastern New York.

28. **Defendant Massachusetts Electric Company**, d/b/a National Grid is a Massachusetts corporation located at 40 Sylvan Avenue, Waltham, Massachusetts 02451, and is a subsidiary of UK National Grid and US National Grid. It serves over 1.2 million electricity customers in 168 communities throughout Massachusetts.

29. **Defendant Nantucket Electric Company**, d/b/a National Grid is a Massachusetts corporation located at 40 Sylvan Avenue, Waltham, Massachusetts 02451, and is a subsidiary of

---

[6] *Id.* at 30-32, 40.

US National Grid. It is an electric retail distribution company providing electric service to approximately 13,800 customers on the island of Nantucket.

## JURISDICTION AND VENUE

30. This Court has subject matter jurisdiction over this controversy pursuant to 28 U.S.C. §§ 1331, 1332, and 1367.

31. Venue is proper in this district pursuant to 28 U.S.C. § 1391 in that one of the Defendants resides here and a substantial part of the events or omissions giving rise to the claims stated herein occurred in this district.

## CLASS ALLEGATIONS

32. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Rule 23") on behalf of the following three subclasses of individuals or entities: (i) all individuals or entities residing or located in Rhode Island who entered into ISAs with one or more of the Defendants, whose projects meet the requirements of the IRS's safe harbor, and whom Defendants wrongly charged a tax gross up that was not owed (the "Rhode Island Subclass"); (ii) all individuals or entities residing or located in New York who entered into ISAs with one or more of the Defendants, whose projects meet the requirements of the IRS's safe harbor, and whom Defendants wrongly charged a tax gross up that was not owed (the "New York Subclass"); and (iii) all individuals or entities residing or located in Massachusetts who entered into ISAs with one or more of the Defendants, whose projects meet the requirements of the IRS's safe harbor, and whom the Defendants wrongly charged an interconnection tax that was not owed (the "Massachusetts Subclass") (collectively, "the Subclasses").

33. Specifically excluded from the Subclasses are: (i) Defendants and any entities in which Defendants had or have a controlling interest; (ii) Defendants' officers and directors, any

members of their immediate families, and their legal representatives, heirs, successors, or assignees; and (iii) any of Defendants' employees.

34. Plaintiffs reserve the right to modify or amend the definition of the proposed Subclasses before the Court determines whether certification is appropriate.

35. The ISAs are standard form agreements mandated by tariffs. In each state, the agreements contain identical or materially indistinguishable language making Plaintiffs responsible for interconnection costs.

36. All of Rule 23's requirements for class certification are satisfied.

37. **Numerosity:** Each subclass is so numerous that joinder of its members is impracticable. While the precise number of members within each subclass is unknown at this time and can only be definitively ascertained through appropriate discovery, Plaintiffs believe that each subclass is, at a minimum, comprised of several hundred class members.

38. Contributions to National Grid's capital by an independent generator qualify for the safe harbor provided that the generator meets certain conditions. Most relevant here, 95 percent of the total power flows over the interconnection must flow from the generator to the utility. A 40-kilowatt project is of a size such that it is very likely to meet this condition. Data on National Grid's website and on the websites of RIPUC, the New York State Department of Public Service, and the Massachusetts DPU reveal that there have been hundreds of registered interconnection projects of this size in each subclass.

39. **Typicality**: The claims of the Rhode Island Plaintiffs, the New York Plaintiffs, and the Massachusetts Plaintiffs are typical of the claims of the members of their respective Subclasses. Like all members of their respective Subclasses, the Rhode Island Plaintiffs, the New York Plaintiffs, and the Massachusetts Plaintiffs entered into ISA agreements with Defendants and were

injured by the same misconduct, *i.e.*, Defendants' wrongful imposition of a tax gross up for a tax that National Grid did not owe.

40. **Adequacy**: Plaintiffs will fairly and adequately represent and protect the interests of the members of their respective Subclasses. They do not have any interests that are contrary to, or in conflict with, the interests of the members of the Subclasses they seek to represent. Plaintiffs have retained counsel that are competent and experienced in complex class action litigation and have sufficient resources to prosecute this action vigorously.

41. **Commonality and Predominance**: Common questions of law and fact exist as to all members of the Subclasses and predominate over any questions that affect only individual subclass members. The questions of law and fact common to each subclass include:

a. Whether, under the Internal Revenue Code, the interconnection charges by the independent renewable energy generators comprising the Subclasses are taxable to National Grid as CIACs;

b. Whether National Grid paid tax on amounts paid by Plaintiffs to National Grid;

c. Whether National Grid violated the covenant of good faith and fair dealing when it charged Plaintiffs the tax gross up;

d. Whether Plaintiffs and the class are owed restitution and/or damages as a result of Defendants' unlawful assessment of the tax gross up;

e. Whether National Grid converted funds belonging to Plaintiffs; and

f. Whether Plaintiffs and the class are entitled to injunctive relief and if so, the nature and extent of such injunctive relief.

42. **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members of each subclass is

impracticable. Furthermore, as the damages suffered by the individual members of the Subclasses may be relatively small, the expense and burden of individual litigation make it impossible for members of the Subclasses to individually seek redress for the wrongs done to them. The prosecution of separate actions by individual members of the Subclasses would create a risk of inconsistent and varying adjudications, which could establish incompatible standards of conduct for Defendants. There will be no difficulty in the management of this action as a class action.

43.     Subclasses, as defined above, should be certified under Fed. R. Civ. P. 23(b)(1) as all requisite elements of that section are met. Class certification will avoid inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

44.     Subclasses, as defined above, should also be certified under Fed. R. Civ. P. 23(b)(2) as all requisite elements of that section are met. Defendants have acted or refused to act on grounds generally applicable to the class, making appropriate final injunctive relief or corresponding declaratory relief with respect to the class on all counts.

## FACTS

**A.     Utilities Are Deliberately Undermining Public Policies Supporting Distributed Generation of Renewable Energy**

45.     The United States Federal Government has enacted laws, adopted policies, and appropriated billions of dollars to bolster a clean energy economy. The Energy Policy Act of 2005 created the Solar Investment Tax Credit ("ITC"), which provides a tax incentive for solar developments sited on residential and commercial properties.[7] The American Recovery and Reinvestment Act of 2009 provided over $90 billion in strategic clean energy investments and tax

---

[7] Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 1038, § 1337 (2005).

credits.[8]   Numerous executive orders have further advanced efforts to "build a clean energy economy that will sustain our prosperity and the health of our people and our environment for generations to come."[9]

46.    State policies incentivized the rapid deployment of DERs in parallel with Federal efforts.

47.    Massachusetts policy is to "continue to remove any impediments to the development of efficient, low-emissions distributed generation . . . taking into account the need to appropriately allocate any associated costs in a fair and equitable manner."[10]   Massachusetts enacted the Global Warming Solutions Act[11] and the Green Communities Act[12] in 2008 to reduce greenhouse gas emissions and provide for the deployment of renewable and alternative energy resources in the commonwealth.   Massachusetts then published a state Clean Energy and Climate Plan outlining an aggressive strategy to, among other things, "replace[] . . . carbon intensive fuels with renewable energy sources."[13]   Massachusetts acted urgently, understanding "policies that support renewable energy are becoming increasingly important[]" to complement federal efforts.[14]

48.    New York has also acted with urgency.   In 2014, New York State launched "Reforming the Energy Vision" ("REV"), a set of multi-year regulatory proceedings and policy initiatives intended to transform the way electricity is produced, bought, and sold in New York.   A

---

[8] American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 138-140 (2009), https://www.congress.gov/111/plaws/publ5/PLAW-111publ5.pdf.
[9] Exec. Order No. 13693, 80 Fed. Reg. 15871 (Mar. 19, 2015), https://www.govinfo.gov/content/pkg/FR-2015-03-25/pdf/2015-07016.pdf.
[10] Mass. Gen. Laws ch. 164 § 142.
[11] 2008 Mass. Acts ch. 298, https://malegislature.gov/Laws/SessionLaws/Acts/2008/Chapter298.
[12] 2008 Mass. Acts ch. 169, https://malegislature.gov/Laws/SessionLaws/Acts/2008/Chapter169.
[13] *Commonwealth of Massachusetts Global Warming Solutions Act 10-Year Progress Report*, EXECUTIVE OFFICE OF ENERGY AND ENVTL. AFFAIRS, 19 (2018), https://www.mass.gov/doc/gwsa-10-year-progress-report/download.
[14] *Id.* at 45.

primary goal of REV is to make it easier for New York consumers and utilities to invest in DERs, providing "new opportunities for energy savings, local power generation, and enhanced reliability to provide safe, clean, and affordable electric service."[15]

49.     In 2019, New York enacted the New York State Climate Leadership and Community Protection Act.  Section 4 of that statute required the Public Service Commission to "establish a program to require that . . . a minimum of seventy percent of the state wide electric generation . . . to meet the electrical energy requirements of all end-use customers in New York state in two thousand thirty shall be generated by renewable energy systems . . . ."[16]  The statute further provided that "the New York state energy research and development authority shall consider enhanced incentive payments for solar and community distributed generation projects . . . ."[17]  New York also adopted regulations to create more precise price signals to incentivize further deployment of DER.[18]

50.     The investor-owned electric utilities perceived these federal and state policies as a threat to their profitability and indeed, to their very survival.  In January 2013, the Edison Electric Institute, the industry association for investor-owned electric utilities, published a report titled "Disruptive Challenges" ("Report").[19]  The Report considered "the financial risks and investor implications related to disruptive challenges" from technological innovations, especially the

---

[15] About the Initiative, *DPS - Reforming the Energy Vision*, NEW YORK STATE DEP'T OF PUBLIC SERVICE, https://www3.dps.ny.gov/w/pscweb.nsf/all/cc4f2efa23551585257dea007dcfe2.

[16] New York State Climate Leadership and Community Protection Act, N.Y. Pub. Serv. L. § 66-p (2).

[17] *Id*. § 66-p (7)(b).

[18] *See In the Matter of the Value of Distributed Energy Resources*, No. 15-E-0751, 2017 WL 976518 (N.Y. Pub. Serv. Comm'n Mar. 9, 2017).

[19] Peter Kind, *Disruptive Challenges: Financial Implications and Strategic Responses to a Changing Retail Electric Business*, EDISON ELECTRIC INSTITUTE (Jan. 2013), https://www.ourenergypolicy.org/wp-content/uploads/2013/09/disruptivechallenges-1.pdf.

dramatic decline in the cost of solar panels.[20]  The Report warned that these "disruptive technologies . . . compete with utility-provided services."[21]  As more and more households and businesses reduce or even eliminate their dependency on the grid, the Report continued, the viability of electric utilities is threatened.  These threats are increased by public policies to promote renewable energy.[22]

51.     The Report concluded that, "The threats posed to the electric utility industry from disruptive forces, particularly distributed resources, have serious long-term implications for the traditional electric utility business model and investor opportunities."[23]  Comparing the situation of electric utility companies to that of land-line telephone companies at the advent of cable and cell phone technology, the Report urged them to "prepare for and develop plans to address disruptive threats . . . ."[24]  They needed to react urgently, the Report said, in order "to survive and to protect investors from a 'Kodak moment.'"[25]

52.     To this end, the Edison Electric Institute recommended that the utility industry take steps to slow or impede the spread of DER.  Most relevant here, the Report recommended that utilities "[c]onsider a customer advance in aid of construction in all states to recover upfront the cost of adding new customers and, thus, mitigate future stranded cost risk."[26]  It also recommended that utilities "develop profit streams to counterbalance the impact of disruptive forces.  Examples

---

[20] *Id*. at 1, 3.
[21] *Id*. at 3.
[22] *Id*. at 4-5.
[23] *Id*. at 17.
[24] *Id*. at 6.
[25] *Id*. at 16.
[26] *Id*. at 18.

of new profit sources would include ownership of distributed resources with the receipt of an ongoing service fee . . . ."[27]

53.     Utility companies heard the alarm sounded by the Edison Electric Institute.  They responded by changing rate structures and placing other barriers in the way of DER and by entering into the DER market as competitors themselves, through subsidiaries and affiliates.   These responses have raised serious antitrust concerns.[28]

54.     These utility company tactics are not only contrary to the public policy of supporting distributed renewable energy, but also contrary to the most basic premise of public regulation of this natural monopoly.  Rate regulation serves

> as a substitute for competition in the business of electricity distribution.  The foundational legal premise for this arrangement is that the IOU [(investor-owned utility)] "was created for public purposes [and] performs a function of the state."  As an instrument of the state, it has unique authorities, such as the power to exercise eminent domain.   In turn, the government has a responsibility to "protect the people against unreasonable charges for services rendered by [the IOU]."
>
> The rate-setting process is thus the core of government oversight.  IOU rates are designed to compensate the utility for the costs it incurs to serve the public, plus a reasonable rate of return on its capital investments in power plants, transmission and distribution lines, and other infrastructure. . . . Tying consumer rates to utility costs is . . . intended to ensure that IOUs do not earn exorbitant profits . . . .

Peskoe, *supra* n. 28, at 111 (quoting *Smyth v. Ames*, 169 U.S. 466, 544-45 (1898)).

---

[27] *Id.*

[28] Michael W. Wara, *Competition at the Grid Edge:  Innovation and Antitrust Law in the Electricity Sector*, 25 N.Y.U. ENVTL. L.J. 1, 9 (2017) (describing "utility death spiral" and industry reaction to Edison Electric Institute study); *see also* Ari Peskoe, *Unjust, Unreasonable, and Unduly Discriminatory: Electric Utility Rates and the Campaign Against Rooftop Solar*, 11 TEX. J. OF OIL, GAS, AND ENERGY L. 101 (2016).

**B.** **In Violation of Public Policy, National Grid Has Acted Broadly to Obstruct Independent Renewable Energy Generators**

55.     Like other investor-owned utilities, National Grid has an interest in raising the costs of independent renewable energy generators. National Grid Ventures, a non-regulated unit of National Grid, competes with Plaintiffs in the development, construction, and operation of renewable energy projects. Together with Ørsted and Eversource, National Grid Ventures is developing a 704 MW wind farm south of the Rhode Island and Massachusetts coasts, expected to be operational by 2023, that will supply electricity in Rhode Island and Connecticut.[29]

56.     On July 15, 2019, National Grid Ventures completed a $100 million acquisition of Geronimo Energy, a leading solar and wind developer in North America.[30]

57.     On October 14, 2020, National Grid Ventures announced the launch of National Grid Renewables, which encompasses Geronimo Energy and "develops, owns and operates renewable energy assets across the United States – including solar, onshore wind and battery energy storage . . . ."[31]

58.     National Grid also owns and controls major interests in natural gas transmission and storage. Natural gas is the largest source of energy for the generation of electric power in the United States, and competes with DERs.

59.     In addition to its wrongful charge of a tax gross up described further below, there are other examples of National Grid's efforts to impede the development of DER. In

---

[29] *See* National Grid Ventures, *Offshore Wind*, NATIONAL GRID, https://www.nationalgrid.com/our-businesses/national-grid-ventures/what-we-do/future-developments.
[30] *See* Grid at work, *National Grid completes acquisition of Geronimo Energy*, NATIONAL GRID (July 15, 2019), https://www.nationalgrid.com/stories/grid-at-work/national-grid-completes-acquisition-geronimo-energy.
[31] *See* Journey to net zero, *Introducing National Grid Renewables*, NATIONAL GRID (Oct. 14, 2020), https://www.nationalgrid.com/stories/journey-to-net-zero-stories/introducing-national-grid-renewables.

Massachusetts, the Department of Public Utilities ("DPU") launched an investigation of National Grid's management of its interconnection process on the ground that actions by the company were likely "to delay the interconnection of affected [solar] projects, which total over 900 MW . . . , or more than half of the Commonwealth's target for solar development . . . .  Based on the record evidence, the delay could be years depending on the length of the study and the time needed to implement any necessary system upgrades."[32]

60.     In RIPUC Docket No. 4568 (2015), National Grid proposed to assess local renewable energy projects an "access fee" based on an allegation that such projects burden the electrical system in ways that are subsidized by other customers.[33]  In response to opposition from the renewable energy development community and environmental advocates, National Grid withdrew its proposal.

61.     Prior to ACP and WED's challenge to National Grid's practice, the utility would estimate interconnection costs for prepayment and then not true up to actual costs unless a customer requested an audit.  This was in violation of sections 5.3, 5.4, and 5.5 of the applicable Standards for Connecting Distributed Generation, which require an interconnecting customer to pay only the "reasonabl[e]" "actual cost[s]" of system modifications.[34]  In the case of both ACP

---

[32] Mass. D.P.U. Order No. 18-150, 2019 MASS. PUC LEXIS 264, at *596-97 (Mass. D.P.U. Sept. 30, 2019); *see also* Robert Walton, "Alleged National Grid management problems at 'the highest levels' prompt Massachusetts investigation," UtilityDive (Oct. 14, 2019), https://www.utilitydive.com/news/alleged-national-grid-management-problems-at-the-highest-levels-prompt-ma/564938/.

[33] Motion for Summary Disposition by Green Development, LLC d/b/a Wind Energy Development, Inc., at 2 (RIPUC Dkt. No. 4568, Sept. 29, 2015), http://www.ripuc.ri.gov/eventsactions/docket/4568-WED-SummaryDisposition.pdf.

[34] For Rhode Island, *see* R.I.P.U.C. No. 2180, *Standards for Connecting Distributed Generation*, THE NARRAGANSETT ELECTRIC COMPANY, § 5 - Responsibility for Costs of Interconnecting a Facility (Sept. 6, 2018), https://www.nationalgridus.com/media/pdfs/billing-payments/tariffs/ri/standards-for-connecting-dg-(09-06-18).pdf; for Massachusetts, *see* M.D.P.U.

and WED, after audit the interconnection costs were reduced by 65 percent.  On November 12, 2014, RIPUC issued an order requiring National Grid to true up to actual costs.[35]

### C.  National Grid Charged Improper Pass-Through Taxes to Interconnect Plaintiffs' Renewable Energy Projects

62.  National Grid forced Plaintiffs to pay a tax gross up for federal taxes that it did not owe.

63.  Section 61 of the Internal Revenue Code defines gross income as income from any source.  26 U.S.C. § 61(a).

64.  Prior to the Tax Reform Act of 1986, 26 U.S.C. § 118, titled "Contributions to the capital of a corporation," provided that customers' payments to public utilities for system improvements necessary to connect them to the grid be treated as "contributions to . . . capital" that were not taxable as income.

65.  The Tax Reform Act amended 26 U.S.C. § 118 to add a new subsection (b) (now subsection (b)(1)), making such contributions taxable.  Section 118 now provides, in relevant part:

> (a) General rule.—In the case of a corporation, gross income does not include any contribution to the capital of the taxpayer.
>
> (b) Exceptions.—For purposes of subsection (a), the term "contribution to the capital of the taxpayer" does not include—
>
>> (1)  any contribution in aid of construction [CIAC] or any other contribution as a customer or potential customer . . . .

26 U.S.C. § 118 (a) - (b)(1) (emphasis added).[36]

---

No. 1320, *Standards for Interconnection of Distributed Generation*, NATIONAL GRID, § 5 - Responsibility for Costs of Interconnecting a Facility (Oct. 1, 2016), https://www9.nationalgridus.com/non_html/Interconnect_stds_MA.pdf.

[35] *See* Memorandum and Summary of Interim Orders (RIPUC Dkt. No. 4483, Nov. 12, 2014), http://www.ripuc.ri.gov/eventsactions/docket/4483-PUC-Interim-Order-Summary(11-12-14).pdf.

[36] In 2017, pursuant to the Tax Cuts and Jobs Act, Pub. L. No. 115-97 (131 Stat. 2132), the last 16 words of §118(b)—"any contribution in aid of construction or any other contribution as a customer or potential customer . . . "—were redesignated §118(b)(1), and a new paragraph (b)(2) was added.  This change has no bearing on the present dispute.

66. Congress' Joint Committee on Taxation explained that the 1986 amendment was enacted because "[t]he Congress believed that all payments that are made to a utility either to encourage, or as a prerequisite for, the provision of services should be treated as income of the utility and not as a contribution to the capital of the utility."[37]

67. The statute and its legislative history thus state explicitly that CIACs are taxable because they are payments made by <u>customers</u> to enable utility service. In effect, they are advance payments for service.

68. In 1988, the IRS issued guidance that outlined the parameters of a safe harbor, specifically distinguishing payments by customers, which are taxable as income, from contributions by independent generators, which are not:

> In a CIAC transaction the purpose of the contribution of property to the utility is to facilitate the sale of power by the utility to a customer. In contrast, the purpose of the contribution by a Qualifying Facility[38] to a utility is to permit the sale of power by the Qualifying Facility to the utility. Accordingly, the fact that the 1986 amendments to Code section 118(b) render CIAC transactions taxable to the utility does not require a similar conclusion with respect to transfers from Qualifying Facilities to utilities.

Notice 88-129, 1988 IRB LEXIS 3720, at *2-3 (I.R.S. July 1, 1988). Because payments by independent generators are in furtherance of power purchases by the utility, not sales, they are not taxable income to it.

69. Notwithstanding that both the Internal Revenue Code and authoritative IRS guidance, *i.e.*, Notice 88-129, provided that payments for system upgrades by independent renewable energy generators are not income to the utility, National Grid seized on a technicality

---

[37] General Explanation of the Tax Reform Act of 1986, Pub. L. No. 99-514, 544 (May 4, 1987).
[38] A "Qualifying Facility" is a small power producer or cogenerator as defined in the Federal Power Act (16 U.S.C. § 796 (17)(C), (18)(B)), as amended by section 201 of the Public Utilities Regulatory Policies Act of 1978, Pub. L. No. 95-617, 92 Stat. 3134.

to argue that the interconnection payments were taxable income. Specifically National Grid argued that because Notice 88-129 used the words "transmission facilities" and "transmission network," the safe harbor does not include independent generation projects such as those of Plaintiffs, which connect to the distribution network rather than the transmission network.

70. The distinction is that the transmission network carries electricity over long distances through high voltage wires whereas the distribution network carries that same power to end users over smaller wires at lower and safer voltages.

71. Nothing in the rationale underlying the safe harbor of Notice 88-129 supports National Grid's contention that the difference between transmission and distribution is in any way relevant to whether such contributions are or are not taxable as income to the utility.

72. In fact, in a September 12, 2014 letter to RIPUC, National Grid itself observed that the reason Notice 88-129 referred to interconnections to a "transmission network" and did not mention distribution was because "[a]t the time IRS issued Notice 88-129, it was typical for such generators to interconnect directly to the utility system at transmission voltage." National Grid explained that although that was no longer the case, "the IRS guidance continued to refer to 'transmission interties.'"[39] In other words, according to National Grid itself, the omission of "distribution" was a historical artifact of no substantive importance.

73. Despite this admission, National Grid continued to pass the alleged income tax through to Plaintiffs.

---

[39] National Grid letter to L.E. Massaro, Commission Clerk, at 2-3 (RIPUC Dkt. No. 4483, Sept. 12, 2014), http://www.ripuc.ri.gov/eventsactions/docket/4483-NGrid-LetterProposal(9-12-14).pdf.

74. Subsequent IRS notices expanded eligibility for the safe harbor.[40] Notice 2016-36 superseded and expanded on the prior notices. It decisively rejected National Grid's distinction between distribution and transmission, stating that "a generator (such as a solar or wind farm) may contribute an intertie to a utility that qualifies under the new safe harbor even if the generator is interconnected with a distribution system, rather than a transmission system . . . ."[41]

75. Notice 2016-36 further stated that, "The Treasury Department and the Internal Revenue Service (IRS) believe that these modifications will promote reliability and economic efficiency throughout the grid and the development and interconnection of renewable energy resources."[42] National Grid's imposition of these unlawful charges has seriously impeded the competitiveness of local renewable energy.

**D.**  **Despite the Fact That Its Own Consultant's Tax Opinion Found Plaintiffs' Position "Compelling," and Contrary to the Opinion of Its Own Director of U.S. Tax Research and Planning, National Grid Insisted That the Tax Was Owed**

76. Under the ISAs that National Grid signed with each Plaintiff and each member of the Plaintiff class, Plaintiffs must pay all interconnection costs.

77. Among those costs, National Grid included the gross up on the purported tax. For example, National Grid's May 24, 2021 Amended ISA with Plaintiff Oak Pembroke includes an estimated gross up of $56,068, and recites:

> The calculation of the tax gross-up adder is included in this cost estimate on the basis of tax guidance published by the Internal Revenue Service, but tax rates and decisions are ultimately subject to IRS discretion. By signing this agreement, the Interconnecting Customer understands and agrees that the tax has been estimated for convenience and that the Interconnecting Customer remains liable for all tax due on CIAC payments, payable upon the Company's demand.

---

[40] *See* Notice 90-60, 1990 IRB LEXIS 425 (I.R.S. July 1, 1990); Notice 2001-82, 2001 IRB LEXIS 450 (I.R.S. Dec. 26, 2001); Notice 2016-36, 2016 IRB LEXIS 383 (I.R.S. June 10, 2016).
[41] Notice 2016-36, *supra* n. 40, at *14.
[42] *Id.*

78.     Yet National Grid itself does not believe that interconnection payments are taxable income to National Grid.  On June 28, 2016, Robert A. Ermanski, National Grid's Director of U.S. Tax Research and Planning, emailed David A. Selig, the IRS attorney who was the "principal author" of Notice 2016-36, to memorialize their recent telephone conversation.  Ermanski there not only confirmed that the IRS shared Plaintiffs' position regarding Notice 2016-36, but also stated that he himself agreed with it, stating as follows:  "During the call, you confirmed that Notice 2016-36 was indeed intended to cover transactions of this type," *i.e.*, payments for connection with a distribution system even where the power never passes to a transmission system. Ermanski continued:

> [T]he continued use of the restrictive term "transmission" in Section IIIB and IIIC of Notice 2016-36 may cause taxpayers to conclude underline(incorrectly) that the new safe harbor is only permitted when electricity which passes through a "distribution" system intertie is ultimately delivered to the utility's "transmission" system.  National Grid urges IRS to provide written clear written guidance indicating that:
>
> - The definition of "Intertie" in Section IIIB includes interconnections with "distribution" systems.
>
> - The ownership requirement of Section III(C)(2) also applies to electricity passing through an "Intertie" which is then distributed via a "distribution" system rather than wheeled or transmitted via a "transmission" system
>
> - The requirement of Section III(B)(4) is satisfied if the "Intertie" is used to distribute rather than transmit electricity[.][43]

79.     In a September 13, 2016 letter to IRS Attorney David Selig, the Edison Electric Institute also stated that it "assume[d] your intent was to provide the same treatment for all transfers of an intertie to a distribution utility as is provided to transfers of intertie property to transmission

---

[43] National Grid letter to L.E. Massaro, Commission Clerk, Attachment B, June 28, 2016 email from National Grid to IRS Counsel, David Selig, at 1 (RIPUC Dkt. No. 4483, Oct. 13, 2016), http://www.ripuc.ri.gov/eventsactions/docket/4483-NGrid-Update-PLRCompliance(10-13-16).pdf.

utilities." The Institute further recognized that requiring tax gross ups "is contrary to the tax policy the Service is implementing in the Notice."[44]

80.     As noted above, already a year and a half earlier, on September 12, 2014, in a letter to RIPUC, National Grid stated its belief that the distinction between transmission and distribution was completely irrelevant to the tax exemption.  In that letter, National Grid recognized that 26 U.S.C. § 118(b)'s exception of contributions in aid of construction from the tax exemption for contributions to capital created by § 118(a) was intended to apply to "customers taking traditional utility service[,]" because their "payments made to utilities as reimbursement for the cost of constructing such interconnections are viewed as prepayments for future utility services . . . ." Whereas such prepayments are income to the utility and therefore taxable, "payments . . . not related to utility services . . . should not be taxed."[45]

81.     While admitting that the distinction between transmission and distribution was irrelevant, National Grid also acknowledged that because it does not pay the tax, instead passing it through to Plaintiffs, it "has no financial incentive to seek a PLR [Private Letter Ruling]"[46] – or indeed, to ascertain in any way whether the tax is owed or not.

82.     National Grid did not acknowledge, however, that it actually has a financial incentive not to seek a Private Letter Ruling, so as to jack up the costs of independent generators.

83.     National Grid could easily determine whether the tax is owed, either by not paying the tax or by paying it and then seeking a refund.  In taking the former course, it would not risk

[44] National Grid letter to L.E. Massaro, Commission Clerk, Attachment C, Edison Electric Institute Sept. 13, 2016 letter to IRS Counsel, David Selig, at 2, 7 (RIPUC Dkt. No. 4483, Oct. 13, 2016), http://www.ripuc.ri.gov/eventsactions/docket/4483-NGrid-Update-PLRCompliance(10-13-16).pdf.
[45] National Grid letter, *supra* n. 39, at 2.
[46] *Id.* at 3.

incurring a tax penalty, because there is "substantial authority" for the position that the tax is not owed. "Substantial authority" is a term of art, defined in Treas. Reg. § 1.6662-4(d). Positions supported by substantial authority are effectively immune from the accuracy-related penalty under 26 U.S.C. § 6662(b).

84. Treasury regulations are specific about how to go about evaluating whether a tax position is supported by substantial authority, and make clear that a position can be supported by substantial authority even if it is probably wrong. Practitioners have ballparked "substantial authority" as meaning that the position has a 35 to 40 percent chance of being correct.

85. The position that National Grid does not owe the tax at issue here is supported by substantial authority, *i.e.*, sources explicitly recognized by the regulations as authoritative: the text of 26 U.S.C. § 118 itself, congressional committee reports, publications of the Joint Committee on Taxation, IRS Notices, and Private Letter Rulings ("PLRs").

86. National Grid's bad faith is evidenced by the fact that on September 12, 2014, when it proposed to settle its dispute with ACP and WED by seeking PLRs from the IRS, it agreed that "[i]f the PLRs provide a <u>reasonable basis</u> to conclude that the tax exemption applies to projects interconnected to electric distribution facilities, the Company will recommend [to RIPUC] that it no longer pay taxes on future projects meeting the IRS criteria and, thus, no longer collect the tax from the eligible projects."[47]

87. Like "substantial authority," "reasonable basis" is a term of art, defined by Treas. Reg. § 1.6662-3(b)(3). It is a low threshold, which practitioners have quantified as between 10 and 25 percent likely correct.

---

[47] National Grid letter, *supra* n. 39, at 4 (emphasis added).

88.     Given this low threshold, if National Grid had been in good faith it would have stopped charging the tax gross up after June 10, 2016, the date of issuance of Notice 2016-36.  This Notice, together with other authority, provided "substantial authority" for Plaintiffs' position, and certainly more than the "reasonable basis" threshold that National Grid had previously identified as sufficient to cause it to stop charging the gross up.

89.     Nevertheless, far from recommending that the tax not be passed through, even in the face of this Notice and of the opinion of its own Director of U.S. Tax Research and Planning, National Grid continued to pass the tax through to Plaintiffs and to press its position in its dispute with ACP that the tax was owed.

90.     In furtherance of its position, National Grid commissioned an opinion from Ernst & Young, LLP.  On September 30, 2016, some three and a half months after the IRS issued Notice 2016-36, Ernst & Young issued an opinion.  After a strained, result-oriented, and fundamentally flawed analysis, Ernst & Young concluded that "strict construction of Notice 2016-36 dictates that the use of the safe harbor set forth in such notice is limited to transfers of property to a regulated public utility that are then used by such utility to facilitate the transmission of electricity over the utility's transmission system."[48]

91.     Among its flaws, it applied a superseded rule from a 1940 case in which the Supreme Court stated that "provisions that provide exemptions from taxation are to be strictly construed."[49]  More recent Supreme Court cases explain that in tax cases, exceptions from a general rule (which in this instance is the rule of 26 U.S.C. § 118(a) that contributions to capital

---

[48] National Grid letter to L.E. Massaro, Commission Clerk, Attachment A, Ernst & Young Memorandum, Sept. 30, 2016, at 8 (RIPUC Dkt. No. 4483, Oct. 19, 2016), http://www.ripuc.ri.gov/eventsactions/docket/4483-NGrid-Response-WED-Objection(10-19-16).pdf.

[49] *Id.* at 6 (citation omitted).

are exempt from taxation) should be "narrowly applied" to further congressional purpose. *Corn Prods. Refining Co. v. C.I.R.*, 350 U.S. 46, 52 (1955); *see also Stiles v. Comm'r of Internal Revenue*, 69 T.C. 558, 562-63 (1978) (citing cases).

92.     Yet even in this result-oriented opinion, Ernst & Young was forced to concede that "it is possible a compelling position could be developed[]" in support of Plaintiffs' view that interconnection payments are not taxable income to National Grid.[50]  This concession is fatal as it acknowledges that a "reasonable basis" could be developed to not pay the tax.

## E.     State Public Utility Commissions Are Unable to Resolve This Dispute

93.     In Rhode Island and in Massachusetts, independent generators have unsuccessfully challenged the tax gross up in administrative proceedings before the respective public utility commissions.

94.     In January 2013, ACP signed an ISA with National Grid estimating $90,429 in interconnection costs, of which $8,231 was alleged tax costs, which ACP paid.[51]

95.     In January 2014, ACP wrote National Grid, requesting a refund of the tax gross up on the ground that its renewable energy project met the criteria for the safe harbor of IRS Notice 88-129.

96.     National Grid refused, arguing that pursuant to IRS Notice 88-129, the safe harbor only applies to interconnections to the transmission system, not to the distribution system.

---

[50] *Id.* at 8-9.
[51] As noted above, after an audit, the utility acknowledged that the interconnection costs were only $32,376.01 and the tax pass-through was only $3,104.05, and gave ACP a refund of the conceded overcharge.

97.    On January 15, 2014, ACP, together with WED, filed a Petition for Dispute Resolution with RIPUC to disallow National Grid's pass-through of the tax as an unreasonable charge under the Rhode Island interconnection tariff.[52]

98.    In response, National Grid argued that RIPUC lacked jurisdiction to decide whether the tax was owed, and further that the safe harbor applied only to transmission interconnections and not distribution interconnections.

99.    On September 12, 2014, National Grid proposed to settle the dispute by obtaining a PLR from the IRS and the parties agreed on this course.[53]  National Grid sought the PLR on August 13, 2015.  On November 9, 2015, the IRS responded by declining to issue a letter ruling on the ground that it would soon issue guidance on the subject.[54]

100.   On June 10, 2016, the IRS issued Notice 2016-36, which definitively resolved the question in favor of Plaintiffs.

101.   Nevertheless, contending that the Notice was still not clear on whether the safe harbor applies to distribution system interconnections, National Grid refused to refund the tax.

102.   On November 27, 2017, RIPUC issued a final Order.  While "noting that they do not sit as tax attorneys or tax experts," the commissioners, with one dissenting vote, nevertheless ruled that "the pass-through tax charges were reasonable in this proceeding."[55]

103.   The petitioners appealed to the Rhode Island Supreme Court.  National Grid argued that that Court could not make a binding ruling on whether or not the interconnection payments

---

[52] Petition, *supra* n. 1.
[53] National Grid letter, *supra* n. 39, at 3-4.
[54] National Grid letter to L.E. Massaro, Commission Clerk, Attachment A, letter from IRS, Nov. 9, 2015 (RIPUC Dkt. No. 4483, Nov. 20, 2015), http://www.ripuc.ri.gov/eventsactions/docket/4483-NGrid-PLR-ResponseIRS_11-20-15.pdf.
[55] Order No. 22957, *supra* n. 2, at 21.

were income subject to federal taxation, and that the tax exemption applied only to transmission upgrades.

104. During oral argument before the Supreme Court, both National Grid and RIPUC conceded that any purported uncertainty in the IRS guidance could be resolved if National Grid filed an administrative claim for a refund with the IRS. Yet despite repeated requests, National Grid has refused to do so.

105. The Rhode Island Supreme Court declined to reach the merits of the tax question. It deferred to RIPUC's conclusion that National Grid's passing on of the tax was reasonable, and expressed its "fervent hope that the IRS will provide clear and concise guidance to these parties in the near future."[56]

106. The issue of the legality of passing through an alleged federal tax on interconnection costs has also been raised by independent generators and advocates in Massachusetts, in a rate proceeding concerning another utility, Eversource.

107. On January 5, 2018, the Massachusetts DPU issued an Order in which it declined to reach the merits of the interconnection tax issue, stating:

> [T]he Department determines that it would be appropriate to open a proceeding in the future to investigate the tax treatment of CIAC carrying charges as applied to the interconnection of distributed generation facilities, with the intent to set a uniform practice for all electric distribution companies.

Order Establishing Eversource's Rate Structure, 2018 WL 369344, at *133 (Mass. D.P.U. Order No. 17-05-B, Jan. 5, 2018). However, to date, the DPU has not opened such a proceeding.

108. National Grid continues to charge Plaintiffs for tax on the cost of the transmission upgrades and annual operations and maintenance charges for those upgrades.

---

[56] *ACP Land, LLC*, 228 A.3d at 338.

109.     National Grid's wrongful charge impedes the competitiveness of local renewable energy.

110.     Plaintiffs and the Plaintiff class have no alternative but to pursue relief in this court.

## CAUSES OF ACTION

## COUNT I

### DECLARATORY JUDGMENT
### 28 U.S.C. § 2201(a)
### (On Behalf of All Plaintiffs and Subclasses)

111.     Plaintiffs repeat and incorporate by reference the allegations contained in the preceding paragraphs of this complaint, as if fully set forth herein.

112.     The federal Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides, in relevant part, as follows:

> In a case of actual controversy within its jurisdiction, except with respect to Federal taxes . . . , any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

113.     Notwithstanding the apparent exclusion of controversies related to federal taxes, 28 U.S.C. § 2201(a) has been construed to allow declaratory judgments with respect to federal taxes where, as here, Plaintiffs are not the taxpayers, have no other remedy, and/or do not seek to enjoin the assessment or collection of any federal tax.  *See, e.g.*, *South Carolina v. Regan*, 465 U.S. 367, 378 (1984).

114.     The language, legislative purpose, and history of 26 U.S.C. § 118(b), and IRS Notices 88-129 and 2016-36, all make clear that the payments at issue here are not CIACs and are not taxable as income to National Grid.

115.    Because the income tax at issue is not a tax on Plaintiffs, but is only passed through

to them, Plaintiffs cannot seek a refund pursuant to 26 USC § 7422(a).  National Grid has no

incentive to seek a refund or take any action that might answer the question of whether the tax is

owed—to the contrary, National Grid's interest is in passing the tax through and thereby raising

the costs of Plaintiffs' interconnection.  Nor can the state commissions or state courts adjudicate

whether National Grid owes the federal tax at issue.


## COUNT II

### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### (On Behalf of All Plaintiffs and Subclasses)

116.    Plaintiffs repeat and incorporate by reference the allegations contained in the

preceding paragraphs of this complaint, as if fully set forth herein.

117.    Rhode Island, Massachusetts, and New York all recognize the common law

covenant of good faith and fair dealing that attaches to any contract.

118.    All three states have standard interconnection agreements.  As the Federal Energy

Regulatory Commission ("FERC") has stated:

> Interconnection is a critical component of . . . transmission service, and [having
> a] standard interconnection procedure[] and a standard agreement applicable to
> [generating facilities] . . . (1) limit[s] opportunities for [utilities] . . . to favor their
> own generation, (2) . . . [removes unfair impediments to] market entry for [small
> generators] . . . by reducing interconnection costs and time, and (3) encourage[s]
> . . . investment in generator and transmission infrastructure[, where needed].

FERC Order No. 2003, Dkt. No. RM02-1-000, 104 FERC ¶ 61,103, at ¶ 12 (2003).

119.    Rhode Islands' and Massachusetts' standard Interconnection Service Agreements

both provide that "[t]he Interconnecting Customer shall be responsible for the System

Modification costs . . . ."[57]  In both states, Attachment 3 to the standard agreements sets forth in detail the specific costs, including the amount of the tax gross up adder for alleged CIAC payments.

120.    The New York State Standardized Contract for Interconnection of New Distributed Generation Units provides that "the Utility shall design, construct and install the [Dedicated] Facilities.  The . . . Customer shall be responsible for paying the incremental capital cost of such [Dedicated] Facilities [in the current version, "Interconnection Facilities"] attributable to the . . . Customer's Unit."[58]  "Dedicated Facilities" or "Interconnection Facilities" are defined as "the equipment and facilities on the Utility's system necessary to permit operation of the Unit in parallel with the Utility's system."[59]

121.    The relationship between Plaintiffs on the one hand and National Grid on the other hand, as parties to the ISAs, gave rise to an implied covenant that they would deal with one another in good faith and would not engage in any conduct to deprive the other of the benefits of that agreement.

122.    This implied obligation was particularly acute with respect to National Grid because it had unilateral authority under applicable tariffs and under the ISAs to:  (i) determine whether the independent renewable energy generators' interconnection payments were taxable income to National Grid; (ii) determine the amount of income tax it owed and the amount of the

---

[57] *See* R.I.P.U.C. No. 2180, Ex. H – Interconnection Service Agreement, § 5 – General Payment Terms, *supra* n. 34; M.D.P.U. No. 1320, Ex. G – Interconnection Service Agreement, § 5 – General Payment Terms, *supra* n. 34.

[58] *New York State Standardized Interconnection Requirements and Application Process For New Distributed Generators and Energy Storage Systems 5 MW or Less Connected in Parallel with Utility  Distribution Systems*, NEW YORK STATE DEPARTMENT OF PUBLIC SERVICE, App. A § 3.6 (March 2021), https://www3.dps.ny.gov/W/PSCWeb.nsf/All/DCF68EFCA391AD6085257687006F396B?OpenDocument.

[59] *Id.*, App. A "Definitions."

offset from depreciating the assets it obtained from Plaintiffs; and (iii) pass on and charge a tax gross up to the independent renewable energy generators.

123.    In violation of the implied covenant of good faith and fair dealing, National Grid charged Plaintiffs for tax gross ups despite the fact that their interconnection payments were not taxable to National Grid as income.

124.    Defendants further violated the implied covenant of good faith by:  (i) ignoring clear IRS guidance and the opinion of their own Director of U.S. Tax Research and Planning; and (ii) soliciting an opinion that was contrary to industry custom and practice and would support the result they sought in order to further their interest in increasing Plaintiffs' interconnection costs.

125.    Because of Defendants' knowing, intentional, and bad faith violations of the implied covenant of good faith and fair dealing, Plaintiffs have suffered substantial damages.

## COUNT III

### RESTITUTION AND UNJUST ENRICHMENT
**Restatement of the Law (3d), Restitution and Unjust Enrichment,
§§ 1, 5-6, 14, 19, 35, 64 *et al.*
(On Behalf of All Plaintiffs and Subclasses)**

126.    Plaintiffs repeat and incorporate by reference the allegations contained in the preceding paragraphs of this complaint, as if fully set forth herein.

127.    Rhode Island, Massachusetts, and New York each recognize a free-standing cause of action for restitution and/or unjust enrichment under the Restatement (Third) of Restitution and Unjust Enrichment (2011) ("Restatement").

128.    Restatement § 1, Restitution and Unjust Enrichment, provides that "[a] person who is unjustly enriched at the expense of another is subject to liability in restitution."

129.    Restatement § 5, Invalidating Mistake, provides, in part, that "[a] transfer induced by invalidating mistake is subject to rescission and restitution."

130.     Restatement § 6, Payment of Money Not Due, provides that "[p]ayment by mistake gives the payor a claim in restitution against the recipient to the extent payment was not due."

131.     Restatement § 14, Duress, provides, in part, "(1) Duress is coercion that is wrongful as a matter of law.  (2) A transfer induced by duress is subject to rescission and restitution. The transferee is liable in restitution as necessary to avoid unjust enrichment."  "[W]here the claimant, in response to pressure, has overpaid a subsisting obligation[], relatively modest pressure may be found to constitute duress if there is no other basis on which to order restitution."  Restatement § 14, Comment b.

132.     Restatement § 35, Performance of Disputed Obligation, provides:

> If one party to a contract demands from the other a performance that is not in fact due by the terms of their agreement, under circumstances making it reasonable to accede to the demand rather than to insist on an immediate test of the disputed obligation, the party on whom the demand is made may render such performance under protest or with reservation of rights, preserving a claim in restitution to recover the value of the benefit conferred in excess of the recipient's contractual entitlement.

The requirement of protest is satisfied when the recipient—here, National Grid—has notice that the entitlement in question is contested.  "Notice is adequate if the recipient is protected against unfair surprise."  Restatement § 35, Comment d.

133.     Restatement § 19 provides, in part:

> Except to the extent that a different rule is imposed by statute, the payment of tax by mistake, or the payment of a tax that is erroneously or illegally assessed or collected, gives the taxpayer a claim in restitution against the taxing authority as necessary to prevent unjust enrichment. "Tax" within the meaning of this section includes every form of imposition or assessment collected under color of public authority.

A 1924 federal statute codified this proposition with respect to federal taxes, "whether or not such tax, penalty, or sum has been paid under protest or duress."  26 U.S.C. § 7422(b).  The Restatement further explains:

> Restitution is allowed . . . for the same reasons that restitution is available in respect of a payment of money not due in a private transaction. Such a payment is involuntary on the part of the payor . . . in the legally meaningful sense that no one intends to pay a tax in excess of a liability that is both accurately and lawfully assessed. It is not the taxpayer's willingness to pay that is the relevant consideration, but whether the payment corresponds to a proper legal liability. To the extent it does not, the result is a transfer that lacks an adequate legal basis.

Restatement § 19, Comment c.

134.    Relatedly, pursuant to Restatement § 64, Passing on; Rights of Third Persons, where a party pays a tax that is not, in fact, owed, and passes that tax on to third parties, such as Plaintiffs here, those third parties have a claim in restitution against the payor of the tax, here National Grid.

135.    Under these rules, separately and/or jointly, National Grid owes restitution of all supposed taxes imposed by it on Plaintiffs.

## COUNT IV

### CONVERSION
### (On Behalf of the Rhode Island Plaintiffs and the Rhode Island Subclass)

136.    Plaintiffs repeat and incorporate by reference the allegations contained in the preceding paragraphs of this complaint, as if fully set forth herein.

137.    Plaintiffs have been charged specified amounts of money identified by National Grid as tax gross up adders.

138.    By letter to RIPUC dated September 12, 2014, National Grid agreed that "all future project developers to whom this issue applies would place an amount in escrow with the Company equal to the potential tax liability, to be refunded if a decision is later made by the PUC that the taxes should not be paid."[60]  National Grid also agreed to refund the $20,593 tax reimbursement

---

[60] National Grid letter, *supra* n. 39, at 4.

payments made by ACP and WED "if the decision is made that the Company should not be paying the tax . . . ."[61]

139. This money is the property of Plaintiffs. National Grid took it unlawfully and has refused to return it despite the IRS's unequivocal statements that the tax is not owed.


## COUNT V

### INTERCONNECTION STANDARDS
### R.I. Gen. Laws § 39-26.3-4.1(a)
### (On Behalf of the Rhode Island Plaintiffs and the Rhode Island Subclass)

140. Plaintiffs repeat and incorporate by reference the allegations contained in the preceding paragraphs of this complaint, as if fully set forth herein.

141. R.I. Gen. Laws § 39-26.3-4.1(a) provides:

> The electric distribution company may only charge an interconnecting, renewable-energy customer for any system modifications to its electric power system specifically necessary for and directly related to the interconnection.

142. The tax gross ups at issue here are not "specifically necessary for and directly related to the interconnection." *Id.*

143. Therefore, they may not be charged to Plaintiffs ACP, the Diocese, or to members of the Plaintiff Rhode Island Subclass.


## COUNT VI

### JUST AND REASONABLE CHARGES
### R.I. Gen. Laws § 39-2-1(a)
### (On Behalf of the Rhode Island Plaintiffs and the Rhode Island Subclass)

144. Plaintiffs repeat and incorporate by reference the allegations contained in the preceding paragraphs of this complaint, as if fully set forth herein.

---

[61] *Id.*

145.     R.I. Gen. Laws § 39-2-1(a) provides, in relevant part, as follows:

Every public utility is required to furnish safe, reasonable, and adequate services and facilities. The rate, toll, or charge, or any joint rate made, exacted, demanded, or collected by any public utility for the conveyance or transportation of any persons or property, including sewage, between points within the state, or for any heat, light, water, or power produced, transmitted, distributed, delivered, or furnished, or for any telephone or telegraph message conveyed or for any service rendered or to be rendered in connection therewith, shall be reasonable and just, and every unjust or unreasonable charge for the service is prohibited and declared unlawful, . . . .

146.     The interconnection taxes at issue here are more than allowed by law, and are therefore unjust and unreasonable.

147.     Therefore, they may not be charged to the Rhode Island Plaintiffs or to members of the Plaintiff Rhode Island Subclass.


# COUNT VII

## JUST AND REASONABLE CHARGES
## N.Y. Pub. Serv. L. § 65
## (On Behalf of the New York Plaintiffs and the New York Subclass)

148.     Plaintiffs repeat and incorporate by reference the allegations contained in the preceding paragraphs of this complaint, as if fully set forth herein.

149.     N.Y. Public Service Law § 65 provides, in relevant part, as follows:

Every. . . electric corporation and every municipality shall furnish and provide such service, instrumentalities and facilities as shall be safe and adequate and in all respects just and reasonable.  All charges made or demanded by any such . . . . electric corporation . . . for . . . electricity or any service rendered or to be rendered, shall be just and reasonable and not more than allowed by law or by order of the commission.  Every unjust or unreasonable charge made or demanded for gas, electricity or any such service, or in connection therewith, or in excess of that allowed by law or by the order of the commission is prohibited.

150.     The tax gross ups at issue here are more than allowed by law, and are therefore unjust and unreasonable.

151.    Therefore, they may not be charged to the New York Plaintiffs or to members of the Plaintiff New York Subclass.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Honorable Court enter judgment in their favor and against the Defendants as follows:

(1) An award to Plaintiffs and the Plaintiff class of direct and consequential damages suffered by them and caused by Defendants' acts and omissions;

(2) In the alternative, an award to Plaintiffs and the Plaintiff class of restitution of all sums wrongfully and/or erroneously paid in tax gross ups to Defendants;

(3) An award to Plaintiffs for their reasonable attorneys' fees and costs;

(4) A Declaration that payments for interconnection to National Grid's distribution system by independent generators of renewable energy who meet the criteria of the IRS safe harbor are not taxable as income to National Grid;

(5) An Order that Defendants cease charging a tax gross up adder on renewable energy projects; and

(6) Any other relief the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all counts so triable.

Dated:  August 2, 2021

PLAINTIFFS,

By their Attorneys,

/s/ Seth H. Handy
Seth H. Handy (#5554)
Helen D. Anthony (#9419)
Justin T. Somelofske (#10262)
**HANDY LAW, LLC**
42 Weybosset Street
Providence, RI 02903
Tel: (401) 626-4839
Fax: (401) 753-6306
seth@handylawllc.com


/s/ David Kovel
David Kovel
John R. Low-Beer
**KIRBY McINERNEY, LLP**
250 Park Avenue, Suite 820
New York, New York 10177
Tel: (212) 371-6600
Fax: (212) 751-2540
dkovel@kmllp.com


/s/ Stephen M. Prignano
Stephen M. Prignano (#3649)
**MCINTYRE TATE LLP**
321 South Main Street, Suite 400
Providence, Rhode Island 02903
Tel: (401) 351-7700 Ext. 227
Fax: (401) 331-6095
Email: sprignano@mcintyretate.com